IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF KANSAS

UNITED STATES OF AMERICA,

        Plaintiff,

v.                                        Case No.  22-10009-JWB

MARION TAYLOR,

        Defendant.

**MEMORANDUM AND ORDER**

This matter comes before the court on Defendant's motion to suppress.  (Doc. 19.)  The government filed a response (Doc. 24) and the court granted Defendant an opportunity to file a reply (Doc. 29).  The matter came before the court for hearing on November 8, 2022.  (Doc. 25.) For the reasons stated herein, Defendant's motion to suppress (Doc. 19) is GRANTED IN PART and DENIED IN PART.

**I.    Facts**

At some point in the days prior to August 11, 2021, Defendant borrowed a car from a friend, Rueben, who arranged for Defendant to pick the car up from a car dealership in Junction City, Kansas.  Defendant believed that the car was owned by his friend's then-girlfriend, Brea, and that he had permission from both of them to drive the car.  He also believed that he could allow people to ride with him in the car and could exclude people from riding in the car.  (Doc. 28 at 6:2–12:5.)

On the morning of August 11, 2021, Defendant and his friend Mondrae James were at a QuikTrip gas station in Wichita, Kansas, when Defendant was recognized by two police officers. Those police officers, Officer Boatright and Officer Kampling, recognized Defendant from

previous interactions with him and from Defendant's rap music videos.   After recognizing Defendant but before initiating contact, Officer Kampling searched Defendant's name in several databases that he could access from the officers' squad car computer.   The first of those databases was NICHE, a database where, at the time,[1] officers could see whether the City of Wichita had issued any warrants for a particular person's arrest.   The NICHE database indicated that Defendant had two outstanding city warrants for his arrest.   (Doc. 24 at 4–5.)

Officer Kampling also accessed Sedgwick County's website showing county warrants.   On that website, Officer Kampling saw that Defendant had one outstanding county warrant for his arrest.   Lastly, Officer Kampling accessed the Kansas Department of Corrections' database, KASPER, to determine whether Defendant had any previous convictions or was on probation or parole and found that Defendant was a convicted felon.   (*Id.* at 5.)

The officers pulled up behind the car at the gas pump and initiated a stop.   Officer Boatright approached the driver's side of the vehicle and Defendant quickly opened the door and stood next to the open driver's side door.   Officer Boatright appeared to be slightly surprised that Defendant exited the vehicle, seeming to say something along the lines of "when you opened the door, I thought you were going to try and run."   (Government's Exh. 1 at 1:00.)   Officer Boatright told Defendant that he had a couple of arrest warrants and handcuffed Defendant, then walked him back to the backseat of the patrol car.   (Doc. 19 at 1–2.)

Defendant asked Officer Boatright about the warrants, and Officer Boatright got into the car to look at the squad car computer so he could answer those questions.   Officer Boatright told Defendant about the warrants from the information he had available to him on the squad car computer.   Within about three minutes of placing Defendant in handcuffs, Officer Boatright

---

[1] Officer Kampling indicated in his testimony during the suppression hearing that the municipal courts no longer input warrants into NICHE.   (Doc. 28 at 93:13–18.)

radioed into dispatch to verify the warrants.  About three minutes after that, dispatch confirmed that Defendant had active warrants and that he had an additional warrant from Newton, Kansas. Dispatch eventually confirmed the warrants and that authorities in Newton, Kansas, wanted Defendant arrested on the warrant from Newton.  (Doc. 24 at 5–6.)

At the time that Officer Boatright approached Defendant and placed him in handcuffs, Officer Kampling approached the passenger side of the car where Mr. James was sitting.  Mr. James opened the passenger door around the time when the officers pulled up behind the car. Officer Kampling placed his hand on the inside of the door while it was partially open.  It is difficult to tell from the AXON body camera video whether Officer Kampling pulled the door fully open or whether Mr. James pushed the door fully open from the inside of the car.  Officer Kampling also could not recall at the hearing whether he used his hand to open the door fully.  (Doc. 28 at 123:14–124:8; Doc. 19 at 3.)

Once the door was open, Officer Kampling saw a bottle of what appeared to be codeine cough syrup lying on the passenger floorboard.  The part of the prescription label which shows the name of the individual to whom the medication was prescribed was torn off.  At that time, Officer Kampling believed he had probable cause to search the vehicle because, in his experience, it is common for people to illegally use prescription cough syrup, particularly when the prescription label has been altered.  Officer Kampling asked Mr. James to step out of the car and stand with another officer who had arrived on scene.  Officer Kampling then leaned into the car to take a closer look at the cough syrup bottle and photograph it and when he leaned into the car, he could see a black handgun lying on the driver's side floorboard.  Officer Kampling did not see the handgun until he leaned in to look at the bottle of cough syrup.  (Doc. 24 at 6–7.)

Officer Kampling then approached Officer Boatright to ask if Officer Boatright had seen a gun at Defendant's feet on the driver's side floorboard.  Officer Boatright answered that he had not.  Officer Kampling collected an evidence kit and tried to open the car's front door, but was unable to do so because the door was locked.  Officer Boatright used the key fob to unlock the door.  At this time, Defendant asked Officer Boatright, "they can search the car?"  Officer Boatright answered that Officer Kampling had seen a gun on the floorboard and they would collect it.  (Doc. 19 at 4.)

Officer Kampling went back to the car and photographed the gun in place where it was, and then with gloves on, he picked up the gun and took additional photographs of the weapon.  He also wrote down the serial number and had Officer Boatright run the serial number through dispatch to determine if the gun was stolen.  Officer Kampling, with another officer's help, conducted a search of the entire car, finding another cough syrup bottle with a torn off label in the center console and a brick of white powder that appeared to be cocaine in the trunk of the car.  There was also a brown backpack in the back seat of the car which contained some marijuana and a third cough syrup bottle with the label torn off.  (*Id.* at 4–5.)

While the search was happening, Officer Henry and Defendant spoke.  At the motion to suppress hearing, Defendant and the government agreed to stipulate that Defendant initiated the conversation with Officer Henry; that Defendant did not say anything incriminating during that conversation; that Officer Henry and Defendant spoke about their children; and that Officer Henry and Defendant spoke about the white powder that was in the trunk of the car and where Defendant purchased it.  (Doc. 28 at 140:25–141:8.)

Officer Hornberger assisted Officer Kampling with field testing the white powder that was found in the trunk.  The field test contains pink liquid, and if the field test indicates a positive

result, the test will have a blue haze separated from the pink liquid.  In this case, the field test indicated a positive result, meaning that the substance field tested as positive for cocaine.  Upon later laboratory testing, the substance was found not to be cocaine.  (Doc. 19 at 5; Doc. 28 at 106:1–11.)

After the car was searched, Officer Boatright read Defendant his *Miranda* rights and asked if Defendant would answer some questions.  Defendant responded that he would answer some of the questions and that it just depended what Officer Boatright asked.  Defendant answered that the car was his friend's car and he believed it was owned by a woman named Brea (his friend's then girlfriend).  He also answered that he had the car for three days and that Brea knew he had it.  (Doc. 19 at 5–6; Doc. 24 at 7–9.)

Officer Boatright asked Defendant to tell him about the gun.  Defendant asked Officer Boatright if he would be able to bond out today, and Officer Boatright explained that he would have bonds for his warrants and that the district attorney would probably assign bond for any other charges.  Defendant also explained that the white powder was fake and a prop for a music video and disputed that the white powder tested positive for cocaine.  Defendant asked to see the test kit, and Officer Boatright explained that he would not be charged for having cocaine unless the powder tested positive for cocaine at the lab.  Defendant also asked about his money and Officer Boatright explained that because of the other items Defendant had, they were seizing the cash as "drug money."  When Officer Boatright asked about the "lean" bottles, Defendant explained that they were fake props for his music video because people cannot tell in a music video if it is real.  (Doc. 19 at 5–6; Doc. 24 at 7–9.)

Defendant asked for help bonding out that day.  Officer Boatright indicated that if Defendant was honest then he could probably help him out.  Defendant asked if it was legal for

him to have a gun because his felonies were more than five years old and Officer Boatright explained that that was incorrect.  Defendant said that someone named "D.D." gave him the gun about two weeks ago and that he was carrying the gun for protection.  Defendant explained that he had never shot a gun and that he could not take firearm safety classes because of his status as a felon.  Defendant admitted that the marijuana officers found was real.  (Doc. 24 at 9.)

Officer Boatright allowed Defendant and Mr. James to speak and exchange a few phone numbers so that one of Defendant's friends or family members could come and pick up the car after Defendant was taken to jail.  Mr. James was not allowed to take the car because he did not have a driver's license.  (*Id.*)

On February 23, 2022, Defendant was indicted by a grand jury with one count of possession of a firearm by a prohibited person under 18 U.S.C. § 922(g)(1).  (Doc. 1.)

## II.     Analysis

Defendant argues that evidence of his arrest, the search of his car, and his statements to Officer Boatright should be suppressed.  (Doc. 19.)  The government argues that Defendant's arrest, the search, and the statements Defendant made all comply with the Fourth Amendment and other applicable law.  (Doc. 24.)  The court takes up each issue in turn.

### A.  Validity of Arrest

Defendant argues that the officers merely believed that Defendant "*possibly* had some active warrants" but that the mere possibility that a defendant has an active warrant is not probable cause to make an arrest.  (Doc. 19 at 9.)  The government argues that the officers reasonably relied on electronic databases to establish that Defendant had active warrants and thus had probable cause to make the arrest.  (Doc. 24 at 16–17.)

An officer must have probable cause to make a lawful arrest.  *United States v. Cowan*, 423 F.Supp.3d 1174, 1178 (D. Kan. 2019) (citing *United States v. Valenzuela*, 365 F.3d 892, 896 (10th Cir. 2004)).   A valid, active warrant for an individual's arrest provides probable cause for the officer to make the arrest.  *See United States v. Thomas*, 730 F. App'x 700, 702 (10th Cir. 2018). The question is whether "the facts and circumstances within [the officer's] knowledge were sufficient for a prudent person to believe there was an active warrant for [Defendant's] arrest." *Id.* at 703 (citing *United States v. Hewlett*, 395 F.3d 458 (D.C. Cir. 2005)).

Officers Boatright and Kampling stopped Defendant and arrested him because they saw three arrest warrants against Defendant in online databases accessible from their squad car computer.  Two of those warrants were issued by the City of Wichita, and one warrant was issued by Sedgwick County.  The officers discovered the municipal warrants by searching a system called NICHE, which was the City of Wichita's database at the time.  At that time, the City of Wichita courts entered city warrants into that system.  (Doc. 28 at 93:11–18.)  Officers could not see the actual warrants but could see information about the warrants in the system.  (*Id.* at 92:20–93:5.) To find out about Sedgwick County warrants, the officers searched a Sedgwick County website.[2] This website allows officers, or even members of the public, to search an individual's name and find out whether they have "possible active warrants that are held by the Sedgwick County Sheriff's Office."  The website includes a disclaimer: "This list is not to be used as a confirmation or probable cause that any warrant is active.  Information contained herein should not be relied upon for any type of legal action."

Both parties cite numerous cases to illustrate why electronic databases are or are not reliable in providing information about warrants to officers.  This court begins with the *Herring*

---

[2] https://ssc.sedgwickcounty.org/SheriffWarrants/WarrantNameSearchForm.aspx.

case, a recent Supreme Court case which discussed whether it is reasonable for law enforcement officers to rely on an electronic database of warrants. *Herring v. United States*, 555 U.S. 135, 147 (2009). In *Herring*, an individual known to law enforcement, Herring, came to the Coffee County Sheriff's Department to retrieve an item from his impounded truck. *Id.* at 137. While he was there, an investigator asked the warrant clerk to check whether he had any active arrest warrants, but the inquiry revealed no such warrants from Coffee County. *Id.* The investigator directed the warrant clerk to call the warrant clerk in nearby Dale County, and the warrant clerks found through a search of Dale County's database that there was an active arrest warrant for Herring. *Id.* The investigator and another officer arrested Herring and he was found to be in possession of methamphetamine and a pistol. *Id.* Unbeknownst to the officers and warrant clerks, the arrest warrant had actually been recalled five months before but for some reason, the warrant was never removed from the database. *Id.* at 138.

The court explained that "[i]f the police have been shown to be reckless in maintaining a warrant system, or to have knowingly made false entries to lay the groundwork for future false arrests, exclusion would certainly be justified under our cases should such misconduct cause a Fourth Amendment violation." *Id.* at 146. Further, "[i]n a case where systemic errors were demonstrated, it might be reckless for officers to rely on an unreliable warrant system." *Id.* In *Herring*, the county's warrant system did not appear to have routine or widespread issues, and it was reasonable for the officer to rely on the system. *Id.* at 147.

The *Herring* case sets the framework needed to decide this issue. One Tenth Circuit case also helps. *See Thomas*, 730 F. App'x at 702–703 (10th Cir. 2018). In the *Thomas* case, a woman called police to her residence because she was concerned about her boyfriend's welfare. *Id.* at 701. An officer responded to the home and spoke with the boyfriend, Thomas, and determined he

was not in distress.  *Id.*  After driving some distance away from the home, the officer looked into Thomas and discovered he had an arrest warrant for a misdemeanor.[3]  The officer did not return to the home and make the arrest.  *Id.*  A week later, the officer was dispatched to a pawn shop where she encountered Thomas again.  *Id.*  She informed her partner that that there was a warrant for his arrest, and her partner arrested Thomas, finding a gun on his person which he was not permitted to have.  *Id.*  After the arrest, police verified the status of the warrant and found that it was still active.  *Id.*

The Tenth Circuit held that it was reasonable for the officer to believe there was still an active warrant for Thomas's arrest.  *Id.* at 703.  While the officer could have been more diligent in confirming that the warrant was still active, a brief period of time (one week) had passed since the officer learned about the warrant and it was reasonable for the officer to assume that the arrest warrant had not been executed or otherwise resolved in that amount of time.  *Id.*  The court also noted that the officer "promptly checked the status of the warrant to confirm that it was still active" after arresting Thomas.  *Id.*

Here, Officer Boatright and Officer Kampling each testified as to the reliability of the systems they used to discover Defendant's arrest warrants, both on direct examination by the government and on cross-examination by the defense.  (Doc. 28 at 22:1–10; 23:20–24:9; 53:15–63:7; 88:19–89:12; 92:11–95:13; 134:16–23; 136:12–137:1.)  Each officer testified that he had never made an arrest based on information in the databases to which he had access and then later found that the arrest warrant was not active.  (*Id.* at 22:1–10; 23:20–24:9; 92:11–94:9.)  Each officer also testified that shortly after Defendant was placed in custody, he verified the warrants through dispatch.  (*Id.* at 32:2–19; 136:20–137:8.)  Review of Officer Boatright's AXON body

---

[3] The case does not make clear whether the officer learned this information from an online database in her squad car, from dispatch, or from any other source.

camera video also shows that within about three minutes of placing Defendant in the back of the police car, Officer Boatright radioed into dispatch to verify the status of the warrants.

This case is like *Thomas*. Here, the officers reasonably believed that Defendant had three active arrest warrants against him based on their review of online databases. In the officers' years of experience, those databases are reliable and have *never* shown an inactive arrest warrant,[4] even if the Sedgwick County website includes a disclaimer. And even if the officers could have been, and perhaps should have been, more diligent in verifying the warrants through dispatch before making the arrest, the officers quickly verified the warrants through dispatch within minutes of making the arrest.

The cases cited by Defendant in his motion to suppress can be distinguished from the facts of this case. (Doc. 19 at 9–12.) These cases serve as more extreme examples where an arrest or detention was unreasonable. *See Bechman v. Magill*, 745 F.3d 331, 332–33, 336 (8th Cir. 2014) (woman arrested at her home on possible warrant later found to be recalled; dispatch did not verify warrant but noted the Sheriff's office would confirm the warrant the next morning; court denied qualified immunity to arresting officer); *Voss v. Feine*, 2010 WL 4780678, at *1–*3, *6–*8 (D. Minn. Nov. 17, 2010) (man arrested at his home on "Keep Our Police Safe" (KOPS) alert and possible warrant which was not valid; court determined officer not entitled to qualified immunity because no evidence presented about reliability of warrant information in KOPS alert but was entitled to qualified immunity for conduct after existence of warrant was verified); *United States v. Aguilar*, 2010 WL 11622980, at *1–*3, *7 (D.N.M. 2010) (woman seized in her motel room on non-extraditable municipal warrant where officers only knew of possible warrant but did not verify

---

[4] This is not to say that these databases are categorically reliable or that every officer has had the same experiences with these databases. The court examines this case under these particular facts and looks to the testimony of these particular officers. These officers each had more than ten years of experience and had never seen a warrant listed in the online databases that was not a valid warrant.

status of that warrant; officers' conduct not reasonable); *Vasquez v. Maloney*, 990 F.3d 232, 236–42 (2d Cir. 2021) (officers detained Vasquez outside mall on belief that he *might* have a warrant based solely on officer's memory of Vasquez from his previous arrests; officers were not entitled to qualified immunity).

Defendant argues that the officers could not rely on their previous arrests based on online database information because the officers did not testify specifically as to when those arrests took place. (Doc. 29 at 2.)  But the officers testified as to their years of experience on the force, Officer Boatright with 12 years (Doc. 28 at 17:7–8) and Officer Kampling with 14 years (*id.* at 90:6–8), and it was implicit from the context of their testimony that they had made numerous arrests before Defendant's arrest in August 2021.  This argument is unavailing.

Defendant also argues that "the government failed to prove the officers ever saw the actual county warrants in those previous cases," perhaps suggesting that the officers would not know if they made arrests on valid warrants. (Doc. 29 at 3.)  Defendant particularly takes issue with Officer Boatright's testimony, upon seeing Defendant's Sedgwick County warrant, that "this is not what we see." (Doc. 28 at 40:20–21.)  But Officer Boatright went on to explain that the warrants he sees at the jail include the individual's photograph and bond information.  (*Id.* at 40:23–25.)  The court finds that the government was not obligated to show that the officers saw actual county warrants in previous cases.

Finally, Defendant argues that the officers' reliance on the warrants listed in the online database is unreasonable because the Sedgwick County website displays a disclaimer that the website lists "possible active warrants" and should not be used as probable cause that any warrant is active. (Doc. 29 at 3.)   But Defendant does not point to any such disclaimer for the City of

Wichita warrants. The court is not convinced that this disclaimer in and of itself is enough to negate the officers' experience obtaining information about warrants through online databases.

The court finds that Defendant's arrest was supported by probable cause.

### B. Search of Car

#### i. Standing to Object to Search

The government argues that Defendant does not have standing to challenge the search of the car either because he did not have a reasonable expectation of privacy in the car or the containers within the car or because he was not unlawfully seized. (Doc. 24 at 9–14.) Defendant argues that he did have a reasonable expectation of privacy in the car because he had permission to use the car and he believed he had the right to exclude people from the car. (Doc. 29 at 1.)

The question here is "whether the person claiming a constitutional violation 'has had his own Fourth Amendment rights infringed by the search and seizure which he seeks to challenge.'" *Byrd v. United States*, 138 S. Ct. 1518, 1526 (2018) (quoting *Rakas v. Illinois*, 439 U.S. 128, 133 (1978)). That question requires the court to consider whether Defendant had a legitimate expectation of privacy in the premises searched, here, the car. *Id.*

The standing inquiry involves two prongs or steps: (1) whether the individual had a subjective expectation of privacy in the place and area searched and (2) whether that expectation is objectively reasonable. *United States v. Valdez Hocker*, 333 F.3d 1206, 1209 (10th Cir. 2003). Some ideas that factor into the consideration of a subjective and objective expectation of privacy are whether the individual has the right to exclude others from the property, whether the individual owns the items in the car, whether the individual specifically testified at the suppression hearing that he had an expectation of privacy, and whether the individual showed that he had a legitimate possessory interest in the car. *See id.*; *see also Byrd*, 138 S. Ct. at 1528.

Defendant testified at the suppression hearing that he borrowed the car from a friend or a friend's girlfriend who he reasonably believed owned the car. He also testified that he believed he had the right to exclude people from the car. Defendant also admitted that most of the items in the car belonged to him. The officers who arrested Defendant even allowed Defendant to decide who could come and pick the car up because Mr. James, his passenger, did not have a license. Based on this evidence, the court finds that Defendant has standing to object to the search of the car.

### ii.   The Search Itself

Defendant argues that the search of the car stemmed from his unlawful seizure, making the search inherently unlawful. (Doc. 19 at 13.) Defendant also asserts several alternative grounds for why the search was unlawful, including that this was not a valid search incident to arrest and that the government cannot successfully show that the plain view doctrine applies. (*Id.* at 13–14.) The government argues that the plain view doctrine applies here and thus the officers were permitted to search the entire car. (Doc. 24 at 19.)

The plain view doctrine applies if the government can show that: "(1) the officer was lawfully in a position from which to view the object seized in plain view; (2) the object's incriminating character was immediately apparent–i.e., the officer had probable cause to believe the object was contraband or evidence of a crime; and (3) the officer had a lawful right of access to the object itself." *Harman v. Pollock*, 586 F.3d 1254, 1264 (10th Cir. 2009) (quoting *United States v. Soussi*, 29 F.3d 565, 570 (10th Cir. 1994)).

"'If … the police lack probable cause to believe that an object in plain view is contraband without conducting some further search of the object,' then its incriminating nature is not immediately apparent and 'the plain-view doctrine cannot justify its seizure.'" *United States v. Gordon*, 741 F.3d 64, 71 (10th Cir. 2014) (quoting *Minnesota v. Dickerson*, 508 U.S. 366, 375

(1993)).  While the object's incriminating nature must be immediately apparent, officers are not required to rule out the possibility of innocent conduct.  *United States v. Shelton*, 817 F. App'x 629, 634 (10th Cir. 2020) (unpublished) (citing *United States v. Arvizu*, 534 U.S. 266, 277 (2002)).

Defendant disputes that Officer Kampling was lawfully in a position from which to view the bottle of cough syrup because he may have opened Mr. James' door wider upon approaching the car.  (Doc. 29 at 9.)  The court may disregard this argument because Officer Kampling could lawfully order Mr. James, a passenger, to step out of the car pending the completion of the stop. *Maryland v. Wilson*, 519 U.S. 408, 415 (1997) ("We therefore hold that an officer making a traffic stop may order passengers to get out of the car pending completion of the stop.").  Accordingly, the government can satisfy step one of the plain view inquiry that the officer was lawfully in a place from which to view the object.

The next question is whether the object, the bottle of cough syrup, immediately appeared to be incriminating.  Officer Kampling testified that he believed the bottle to be illegal immediately upon viewing it.  (Doc. 28 at 100:1–14; 127:19–128:9.)  But Officer Kampling also testified that upon seeing the bottle with the partially torn off label, he "wanted to see what kind of prescription it was, if it was a controlled substance" and that he "was going to look to make sure that was what [he] thought it was and to look for more." (*Id.* at 127:19–22; 100:1–14.)  Accordingly, Officer Kampling did not know *immediately* upon viewing the bottle that it was illegal.  He had to lean into the car to take a closer look at the bottle to see whether it was a controlled substance, although clearly he had a hunch that it was illegal upon viewing it from outside the car.

Because Officer Kampling did not immediately know that the bottle of prescription cough syrup with the partially torn label was illegal upon viewing it from the outside of the car, Officer

Kampling did not have probable cause to search the car.  While Officer Kampling had a hunch that the bottle was illegal based on his knowledge and experience as an officer, he did not know that the bottle contained a controlled substance until he leaned into the car and looked at the label.  (*Id.* at 127:19–22; 100:1–14.)  Even if the partially torn label was highly suspicious, an officer cannot obtain probable cause by piling hunch upon hunch.  *See United States v. Cooks*, 222 F. Supp. 3d 965, 970 (D. Kan. 2016).

Accordingly, because Officer Kampling did not have probable cause to enter into the car to look at the bottle of cough syrup more closely, he was not lawfully in a position to view the weapon that was lying on the driver's side floorboard and the discovery of the weapon and any other results of the search of the car must be suppressed.

### C.  Defendant's Statements and *Miranda*

Defendant argues that his statements were involuntary both under the Fourth Amendment and Fifth Amendment.  (Doc. 19 at 15.)  As to the Fourth Amendment, Defendant argues that because the arrest and the subsequent search of the car violated the Fourth Amendment, so too did his statements to police afterwards.  (*Id.*)  Defendant argues that even if the court does not find any Fourth Amendment violations, Defendant's statements are still inadmissible under the Fifth Amendment because the officers' statements to Defendant caused his will to be overborne.  (*Id.* at 15–16.)  The government argues that there was no Fourth Amendment violation and that Defendant's voluntary statements, made after waiving his *Miranda* rights, are admissible.  (Doc. 24 at 22–28.)

The court does not find a Fourth Amendment violation as to Defendant's arrest but finds a Fourth Amendment violation as to the search of the car without probable cause.  Accordingly, the court must consider the temporal proximity of the Fourth Amendment violation and Defendant's

statements, the presence of any intervening circumstances, and the purpose and flagrancy of any police misconduct. *Brown v. Illinois*, 422 U.S. 590, 603–604 (1975). The burden is on the government to show the statements are admissible. *Id.* at 604.

Here, the first two factors weigh heavily in favor of suppression. The search of the car immediately preceded Defendant's interrogation by officers. The subject of the questioning was the weapon and other things found in the car during the search, including fake prop cocaine, the bottles of cough syrup, and the marijuana. There were no intervening circumstances and no break in time between the search and Defendant's statements.

As to the last factor, the purpose and flagrancy of any police misconduct, the court finds that this factor is neutral. Here, the officers believed (incorrectly) that they had probable cause for the search. And Officer Boatright read Defendant his *Miranda* rights before he questioned him. Accordingly, this questioning of Defendant is only misconduct in the technical sense that it flowed from the improper search of the car. It is clear that the officers believed the search was valid, and there would have been nothing wrong with the questioning of Defendant in this manner if the search was in fact proper.

Ultimately, however, the court finds that Defendant's statements were simply too close in time and circumstance to the illegal search of the car. The court thus finds that Defendant's statements must be suppressed.

### D. Speedy Trial and Trial Setting

The trial in this case would ordinarily have to be set within five days of the date of this order because there are only five days remaining for trial under the Speedy Trial Act. This would not allow the parties much time to prepare for trial, nor would it allow sufficient time to summon a jury, particularly so close to the new year. The court finds it is in the interests of justice to

16

continue the trial on its own motion to allow the parties additional time to prepare and so that a jury may be scheduled in due course.

The Speedy Trial Act protects Defendant's constitutional right to a speedy trial and serves the public interest in prompt proceedings. *United States v. Saltzman*, 984 F.2d 1087, 1090 (10th Cir. 1993). The Act requires "that an accused person's trial must begin within seventy days of his indictment or initial appearance, whichever is later." *United States v. Cano–Silva*, 402 F.3d 1031, 1034 (10th Cir. 2006) (citing 18 U.S.C. § 3161(c)(1)). Certain periods of delay are not included in computing the time limits. The section at issue here, 18 U.S.C. § 3161(h)(7)(A), excludes:

> Any period of delay resulting from a continuance granted by any judge on his own motion or at the request of the defendant or his counsel or at the request of the attorney for the Government, if the judge granted such continuance on the basis of his findings that the ends of justice served by taking such action outweigh the best interest of the public and the defendant in a speedy trial. No such period of delay resulting from a continuance granted by the court in accordance with this paragraph shall be excludable under this subsection unless the court sets forth, in the record of the case, either orally or in writing, its reasons for finding that the ends of justice served by the granting of such continuance outweigh the best interests of the public and the defendant in a speedy trial.

In order to grant an ends of justice continuance, the court must specifically identify the reasons for granting the continuance. *See United States v. Toombs*, 574 F.3d 1262, 1269 (10th Cir. 2009). A record consisting of only short, conclusory statements lacking in detail is insufficient. *Id.* at 1271.

The ends of justice are served by granting this continuance and setting trial to begin on February 6, 2022. Here, Defendant requested to submit additional briefing on this motion to suppress, which delayed resolution of this motion. This continuance will allow the parties time to prepare for trial, rather than requiring them to prepare for trial in the five days between when this order is filed and when trial would otherwise be set. It would not serve the ends of justice to

require the parties to rush preparing for trial, particularly where it could be challenging to subpoena witnesses and summon a jury in such a short period of time in the midst of the holidays.

**III.     Conclusion**

Defendant's motion to suppress (Doc. 19) is GRANTED IN PART and DENIED IN PART.  Evidence of the search of Defendant's car and Defendant's statements are suppressed. Defendant's trial is continued and set to begin on February 6, 2023, with a status conference to be set approximately two weeks in advance of trial.

IT IS SO ORDERED this 29th day of December, 2022.


_____s/ John W. Broomes_____
JOHN W. BROOMES
UNITED STATES DISTRICT JUDGE